[No. 15413. Department One.· January 7, 1920.]

NELLIE PRIDMORE, *Respondent*, v. NORTHERN PACIFIC RAILWAY COMPANY, *Appellant*, PIERCE COUNTY, *Defendant*.[1]

RAILROADS (34)—LIABILITY—MAINTENANCE OF OVERHEAD CROSSINGS —STATUTES. Under Rem. Code, § 8733-5, providing that the framework and abutments of an overhead highway and railway crossing shall be maintained by the railway company, and the roadway thereover and the approaches by the county or municipality, everything above the framework and abutments would be part of the roadway, and the railway company would not be responsible for a defective bulkhead or railing above the planking of the roadway.

SAME. In such a case, if the curve was dangerous, there could be no recovery against the railway company, since the danger would depend upon protection by a barrier or guard-rail.

Appeal from a judgment of the superior court for Pierce county, Card, J., entered February 11, 1919, upon the verdict of a jury rendered in favor of the plaintiff, in an action for wrongful death. Reversed.

[1]Reported in 186 Pac. 862.

*Geo. T. Reid, J. W. Quick,* and *L. B. da Ponte,* for appellant.

*Bates & Peterson* and *Sullivan & Christian,* for respondent.

MAIN, J.—This action was brought by the plaintiff against the Northern Pacific Railway Company and Pierce county to recover damages for the death of her husband on April 1, 1917, by reason of an automobile in which they were riding going off the Olympia end of the overhead structure crossing the tracks of the railway company near Nisqually station. The cause was tried to the court and a jury, and resulted in a verdict against the railway company and in favor of the county. Motions for judgment notwithstanding the verdict and, in the alternative, for a new trial being seasonably made and overruled, the railroad company appeals.

The facts necessary to present the controlling question in the case may be summarized as follows: In the spring of the year 1913, the appellant constructed, near Nisqually station, an overhead crossing over its tracks. This crossing was on the principal highway between the city of Tacoma and Olympia and Portland. The crossing was approached from the Olympia end first, on a grade of about nine per cent, which was reduced to about four or five per cent where the turn was made onto the crossing. The roadway of the crossing was about twenty-five feet above the tracks. At the edge of the roadway, on the outside of the curve, was a guard rail, four by six, placed upon two-inch blocks, and a railing three or four feet high placed upon posts. The plans by which the crossing was constructed, prepared by the engineer of the appellant, did not provide for a super elevation on the outside of the curve. An engineer called by the respondent testified that there

was "no super elevation shown on the diagram of the bents, which would indicate that it was level on the curve, if it was not for the fact that the caps are placed in a skewed position instead of being on the radical line, which would account for a slope toward the outside of the curve." The evidence shows that the outside of the curve was not to exceed two or three inches lower than the inside, and could not be detected by observation, but was indicated by the fact that the water would flow in that direction. The curve was described as a sharp one which went through an angle of ninety degrees in a distance of about sixty feet. The roadway on the crossing and curve was twenty-four feet wide.

On the afternoon of April 1, 1917, the respondent, with her husband and two other persons, approached the crossing from the Olympia end in an automobile which was driven by the respondent's husband. The car, as they approached, did not successfully make the turn, but struck the barrier on the outside of the curve, passed over the guard-rail, broke the railing and fell to the railroad tracks below. The respondent's husband was killed, and it is for his death that this action is sought to be maintained.

The respondent described the manner of the happening of the accident as follows:

"Well, it seems just as we made the curve we were headed in the right course, but the machine skidded, as I can judge, the back wheels must have skidded, and there seemed to be a slight hesitation. Whether they caught on the stringer of the bridge or what, but something seemed to catch them; it was so slight we just simply dropped over so easily, scarcely made any noise."

There was other testimony supporting this view, and there was also testimony which indicated that the car, instead of making the turn as it came upon the curve,

went straight ahead over the guard-rail and through the railing.

A number of questions are discussed in the briefs, but the one question which is decisive is whether, under the statute of this state which prescribes respectively the duty of a railroad company and a county or municipality relative to the maintenance of overhead crossings, there can be any recovery. In 1913, the legislature passed an act relating to such crossings (Laws of 1913, ch. 30, p. 74; Rem. Code, § 8733-1 *et seq.*). Section 5 of this act, so far as material to the present controversy, provides:

"When a highway crosses a railroad by an over-crossing or under-crossing, the framework and abutments of the over-crossing or under-crossing, as the case may be, shall be maintained and kept in repair by the railroad company, and the roadway thereover or thereunder and approaches thereto shall be maintained and kept in repair by the county or municipality in which the same are situated, . . ." Rem. Code, § 8733-5.

There is a further provision relative to state roads, and also a proviso, neither of which are here material. It will be noticed that, in the quoted portion of the statute, the framework and abutments of an overhead crossing are to be maintained by the railway company, and the roadway thereover and the approaches by the county or municipality. The use of the word "thereover" would indicate that everything above the framework and the abutments was to be considered as a part of the roadway. Framework, as applied to things built or constructed, means that which furnishes form or strength, or both. In the statute it is used in contradistinction to the roadway which is to be placed upon the framework and the abutments. If this view is correct, everything above the framework and abutments would be a part of the roadway, which would

include the flooring and everything above that. This would make the bulkhead and railing, being above the planking of the roadway, a part of such roadway. Under the statute, the overhead crossing is divided into two parts, one the framework and abutments, which has a tendency to point out that which constitutes the carrying strength of the crossing; and the other part, the roadway, would seem to relate to that which, within the limits of the carrying strength of the framework and abutments, supports the burden of travel.

This case is closely analogous to the case of the *Selectmen of Natick v. Boston & A. R. Co.*, 210 Mass. 229, 96 N. E. 347. In that case the material words of the statute were:

"The expense of maintenance and repair shall be paid as follows: . . . The framework of the bridge and its abutments shall be maintained and kept in repair by the railroad corporation, and the surface of the bridge and its approaches shall be maintained and kept in repair by the city or town."

Construing this statute, it was there said:

" 'Surface' is used in contradistinction to 'framework' and is tantamount to flooring when one considers a bridge as a whole, to be kept in repair in part by a railroad and in part by a town. The railroad furnishes the support or 'framework' for the road or 'surface' which the town is to maintain. If the report of the commissioners had required but one layer of planks five inches in thickness, that plainly would have been all 'surface.' The fact that two layers, each of thinner planks, were ordered does not affect the substance of the matter, which was in fact the surface of the street as distinguished from the supporting framework.

"In the division of the whole structure of a bridge into these two parts, the word 'framework' has some tendency to point out that which constitutes the carrying strength of the bridge, while 'surface' seems more nearly to relate to that which within the limits of the

carrying strength supports the immediate burden of travel. Both layers of planks are needed for this latter purpose."

While the Massachusetts statute uses the word "surface" in the same connection that our statute uses the word "roadway," it is clear that the word "roadway" is at least as comprehensive as the word "surface," and probably more so. The holding in that case supports the interpretation given to the statute here involved, as above indicated. This interpretation is simple, direct and natural, and avoids troublesome questions of liability which might arise if the difference between framework and abutments, on the one hand, and roadway, on the other, is not clearly defined. Under this view, the railroad company would not be liable for failure to maintain any part of the roadway, which would include the planking and the barrier. If there was liability on account of a defect in either of these, it would be that of the county, in whose favor the jury returned the verdict, and from the judgment entered thereon no appeal is prosecuted. It is said, however, that the curve was too sharp, but this of itself, if true, would not permit recovery. Whether a particular curve is dangerous would depend upon whether it was sufficiently protected by a barrier or guard-rail. If the curve was on the approach it was a matter which, under the statute, the county or city was required to maintain, and the railroad company would not be liable for what happened on the approach.

In the complaint there were a number of specifications of negligence, but other than that of the barrier, the slope of the curve, and the shortness of the curve, there is no evidence in their support. Under the evidence in this case it is clear that the primary cause of the accident, if it be assumed that there was defective construction, was that of an insufficient barrier or

guard-rail. The respondent testified, as above set out, that the back wheels must have skidded and there seemed a slight hesitation and the car easily dropped over. In determining whether a guard-rail is sufficient, attention must be given to the surrounding circumstances of the particular case.

"Having regard to the character and amount of travel; the nature of the road itself, its width and general construction, the extent of the slope or descent of the bank, the length of the portion claimed to require a railing, whether the danger is concealed or obvious, the character of the place between which and the traveled road it is claimed the barrier should be erected, and the extent of the injury likely to occur if a railing is not maintained. That is to say, the question in each case is whether, under the facts disclosed by the evidence, the county, by not erecting the barrier, failed in its duty to maintain the highway in a reasonably safe condition for ordinary travel." *Culley v. King County,* 101 Wash. 38, 171 Pac. 1034.

The accident in the present case was not due to any defect in the framework or abutments of the crossing. The legislature had the right to determine the respective liabilities of the railroad company and the county or city, and having spoken upon the subject, its will is controlling.

It may be admitted that, under the common law rule, the appellant would be liable. The authorities cited by the respondent on this question state the common law rule, or construe statutes which are substantially a reenactment of the common law. In none of the authorities relied upon as sustaining liability was a statute involved similar to the statute of this state.

The judgment will be reversed, and the cause remanded with direction to the superior court to dismiss the action.

HOLCOMB, C. J., PARKER, MACKINTOSH, and MITCHELL, JJ., concur.